**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1971-23

IN THE MATTER OF PROTEST
OF DENIAL OF THE
PREQUALIFICATION
APPLICATION OF BIG TOWS,
INC. FOR ROUTINE TOWING
AND EMERGENCY SERVICES
FOR ZONE 14 GARDEN STATE
PARKWAY.

_____

Submitted March 19, 2025 – Decided July 1, 2025

Before Judges Currier and Paganelli.

On appeal from the New Jersey Turnpike Authority.

Diktas Gillen, PC, attorneys for appellant Big Tows Inc. (Christine Gillen, on the briefs).

DeCotiis, Fitzpatrick, Cole & Giblin, LLP, attorneys for respondent New Jersey Turnpike Authority (John Profita, on the brief).

PER CURIAM

Big Tows Inc., (Big Tows) appeals from the final agency decision of the

New Jersey Turnpike Authority (Authority) rejecting its protest of the denial of

its prequalification application.  Because we conclude the Authority's decision was not arbitrary, capricious or unreasonable, we affirm.

We glean the procedural history and facts from the hearing record.  On August 16, 2022, the Authority issued a request for the "Prequalification of Contractors for Routine Towing Services on Various Areas of the New Jersey Turnpike and/or Routine Towing Services and Emergency Services on Various Areas of the Garden State Parkway."  According to the specification, "in order to submit a bid for Routine Towing Services and/or for Routine Towing Services and Emergency Services . . . interested towing contractors must first be prequalified pursuant to th[e] prequalification process."

As relevant here, the prequalification specification required:

> Storage of vehicles must be at said Garage Facility. Storage of vehicles shall be in a secure area defined as a facility that is indoors or is surrounded by a fence, wall or other man-made barrier that is at least six . . . feet high and is lighted from dusk until dawn to deter trespassers and /or vandalism.

Further, the specification stated:

> As part of the Prequalification process, Applicant's . . . facilities . . . [are] subject to inspection by Authority personnel and/or the New Jersey State Police.  **Garage Facility Inspections will be unannounced**.  It is the responsibility of the Applicant to demonstrate that the requirements of th[e]

Prequalification Application are satisfied within the Garage Facility.

Big Tows submitted an application for prequalification. On January 19, 2023, the Authority conducted an inspection of Big Tows' facility. On October 4, 2023, Janet Rzepka (Rzepka), Director of Procurement and Materials Management, wrote to Big Tows:

> [I]t has been determined that Big Tows . . . does not meet the minimum requirements set forth in the Prequalification Application and is therefore ineligible to submit a bid . . . .
>
> Insufficient fencing in storage area . . . .
>
> Accordingly, Big Tows[1] . . . Prequalification Application for routine towing services on the Parkway is denied. An applicant aggrieved by a decision as to its prequalification status may request, in writing, a hearing pursuant to a process outlined in Regulations of the Authority.

The next day, Ricardo Fijor (Fijor), President of Big Tows, responded to Rzepka:

> I am in [r]eceipt of your letter [d]ated October 4, 2023[,] stating Big Tows . . . does not meet the minimum requirements set forth in the prequalification application making Big Tows . . . ineligible to submit a bid . . . . The reason [s]tated was insufficient fencing in storage area . . . .
>
> I reviewed the requirements . . . "Storage of Vehicles shall be in a secure area defined as a facility

3 <span>A-1971-23</span>

that is indoors or is surrounded by a <u>fence, wall or other man-made barrier that is at least six . . . feet high</u>." At the time of the inspection the property/garage of Big Tows . . . had and still has all that was required . . . . The property is fenced, lighted and secured all around its perimeter by [f]ence, walls, and man-made barriers that at minimum was 6 feet high.

After the inspection a few weeks passed and we installed a fence in the area where our property follows [R]oute 17 northbound on top of the berm, concrete that followed the running brook and steep drop, to remove any doubt of not meeting minimum requirements. We called advising this was done and requested that it be noted and proper[l]y reinspected. I was advised everything was put on hold without any time frame as to when someone could get back to me to discuss, or come out to inspect.

At this time, I would like to request a hearing for this decision.

On December 14, 2023, John LaBella (LaBella), Director, Toll Collection of the Authority held the hearing. LaBella was "designated by the Executive Director to serve as the Hearing Officer."[1]

At the hearing, the Authority was represented by its general counsel and William McDonough (McDonough), Manager of Emergency Services, Operations Department. Big Tows was represented by Fijor and its counsel.

_____

[1] Under N.J.A.C. 19:9-2.12(b), "[u]pon the filing of a timely protest, the Executive Director or his or her designee shall have the authority, but not the obligation, to conduct a hearing . . . ."

We recite the following exchange from the transcript of the hearing:

> [LaBella]: . . . With respect to the issue of insufficient fencing in the storage area . . . please tell me what you saw or did[ no]t see that le[]d to your conclusion.
>
> [McDonough]: . . . . We went outside to take a look at the storage area, and it was very clear that unfortunately for Big Tows, the storage area in which they would store our Turnpike vehicles was not fenced in which according to the prequal[ification] needed to be done, completed.

When LaBella presented McDonough with photographs of the storage area, the following exchange occurred:

> [LaBella]: . . . can you please describe what each of the photographs . . . depict?
>
> [McDonough]: This is the storage area which as I stated previously was not fenced in unfortunately according to our spec[ification]s of the prequal[ification].
>
> [LaBella]: Did you witness any evidence that fencing was being installed to secure the storage lot?
>
> [McDonough]: No, sir, I did[ no]t.
>
> [LaBella]: Was there anything else that you[ woul]d like to tell me about why it was deemed that [Big Tows] d[id] not meet the prequalification requirement.
>
> [McDonough]: No, sir.

After reading the specification, the following exchange occurred:

5

[LaBella]: . . . Does the storage lot where [Big Tows] operates comply with the prequalification applications?

[McDonough]: No, sir. It does not.

[LaBella]: And why is that?

[McDonough]: It is not surrounded by a fence, wall, or other manmade barrier.

Fijor provided the following testimony in response to his attorney's questioning:

[Attorney]: What is your understanding as to why [prequalification] was denied?

[Fijor]: My understanding is that the property did[ no]t have sufficient fencing.

. . . .

[Fijor]: You either have to have the property completely fenced, or it needs to be surrounded by any type of wall or other manmade barrier that[ i]s at least six feet high.

When asked to describe the terrain of the area in question, Fijor stated:

When it gets close to the property where the fence is now, right before the fence, there is a, like, concrete block walls. They[ a]re about two and a half feet high. They[ a]re stacked four high. And then as you continue down the property, there [are] the rocks inside the cage that we stacked up three high in order to keep the stream, the little brook, from coming onto the property. There[ i]s also a concrete[,] like a retaining wall for the

6

little bridge that crosses to the back which is from the brook[,] it[ i]s about [nineteen] f[ee]t high. . . .

[Attorney]: . . . . So between the end of your property and Route 17, is there a drop?

[Fijor]: Yes, there is.

[Attorney]: And approximately how far is the drop, the distance between your macadam and the natural terrain.

[Fijor]: It[ i]s at least [a forty] to [fifty-]foot[]drop.

. . . .

[Attorney]: So you . . . built . . . a wall from the lowest point which you claim is about [thirty] feet down which would come up to the macadam on your property?

[Fijor]: Correct.

. . . .

[Attorney]: And how long a wall did you build in that area . . . with this configuration of cages and rocks.

. . . .

[Fijor]: Yeah, I[ woul]d say [three hundred] feet.

[Attorney]: . . . What is the height . . . of the wall that you built?

[Fijor]: Well, it depends where on the property, but it's definitely a minimum of six feet high on the lowest part.

A-1971-23

Further, Fijor testified that "less than two weeks" after the inspection, and "way before the denial," Big Tows fenced in the area. When he requested the Authority to come back out to the facility he was "told it was on hold."

Following the hearing, LaBella authored an eight-page recommendation detailing the hearing and his decision. LaBella reviewed McDonough's and Fijor's testimony and pictures of the area submitted by the parties.

LaBella noted McDonough's testimony "that the fence was not in place" and the pictures corroborated "the fence was missing." Further, according to LaBella, "Fijor, testified . . . there was no fence in the rear of Big Tows' property along a section of . . . Route 17." Instead, "Fijor explained that the fencing was later installed (approximately within two weeks of the Authority's inspection of Big Tows' Facilities)." LaBella noted that "[s]everal pictures were presented by Big Tows . . . [that] showed that the fence at the rear of . . . Big Tows' property had been installed at some time after the inspection took place." LaBella found the "retaining wall along . . . Route 17 that [Fijor] . . . installed, . . . was not [six] feet above ground."

LaBella described Big Tows' failure to correct the fencing deficiency between the time it submitted its application for prequalification and the inspection as "inexplicable." Further, LaBella cited the specification noting "[i]t

8

is the responsibility of the Applicant to show to Authority personnel that the requirements of this Prequalification Application are satisfied within the garage facility."

LaBella stated:

> It is reasonable for the Authority to expect that an applicant be in compliance with all of the requirements of the Prequalification Documents at the time it submits its application. It is eminently reasonable that, upon inspection, compliance with all requirements in the Prequalification Documents be demonstrated at that time. Here, Big Tows[] failed on both counts . . . .

Therefore, LaBella concluded "the protest filed by Big Tows challenging the Authority's denial of Big Tows' prequalification application should be denied."

On February 5, 2024, James Carone, Executive Director of the Authority, "reviewed [LaBella's] recommended decision" and "concur[red] with and adopt[ed] the . . . decision as a final decision of the . . . Authority."

On appeal, Big Tows contends the Authority erred in denying its prequalification application because: (1) it complied "with the clear terms of the application's specifications permitting walls at least six feet high as an alternative to fencing" and the Authority "accepted no alternative to fencing"; (2) "Big Tows' installation of a fence to supplement the other man-made barriers

9

on its property within two weeks of inspection . . . [wa]s a minor, non-material irregularity that could have and should have been waived by the Authority under the circumstances"; (3) "it was 'ready and able' to comply" with the prequalification specification "if awarded the contract"; and (4) the Authority's "factual findings were not supported by substantial evidence in the record."

Appellate review of an agency's decision relating to bidding specifications is limited. See George Harms Constr. Co. v. N.J. Tpk. Auth., 137 N.J. 8, 27 (1994).

> The judicial role is restricted to four inquiries: (1) whether the agency's decision offends the State or Federal Constitution; (2) whether the agency's action violates express or implied legislative policies; (3) whether the record contains substantial evidence to support the findings on which the agency based its action; and (4) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Ibid.]

"The 'fundamental consideration' in reviewing agency actions 'is that a court may not substitute its judgment for the expertise of an agency . . . .'" In re Distrib. of Liquid Assets upon Dissolution of Reg'l High Sch. Dist. No. 1, 168 N.J. 1, 10 (2001) (quoting Williams v. Dep't of Hum. Servs., 116 N.J. 102, 107 (1989)). "When an agency's decision meets those criteria, then a court owes

10

substantial deference to the agency's expertise and superior knowledge of a particular field." In re Hermann, 192 N.J. 19, 28 (2007). Therefore, "[a]n administrative agency's final quasi-judicial decision will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." Id. at 27-28. "Deference controls even if the court would have reached a different result in the first instance." Id. at 28.

Prequalification requirements and bidding specifications are the type of matters within the Authority's area of technical expertise and are thus entitled to deference. See In re Protest of Award of On-Line Games Prod. & Operation Servs. Cont., Bid No. 95-X-20175, 279 N.J. Super. 566, 593 (App. Div. 1995) ("Treasurer's decisions as to responsibility of the bidder and bid conformity are to be tested by the ordinary standards governing administrative action.").

"The burden of demonstrating that the agency's action was arbitrary, capricious or unreasonable rests upon the [party] challenging the administrative action." Lavezzi v. State, 219 N.J. 163, 171 (2014) (alteration in original) (quoting In re J.S., 431 N.J. Super. 321, 329 (App. Div. 2013)).

Applying these well-established principles, we conclude Big Tows failed to sustain its burden that the Authority's rejection of its prequalification application was arbitrary, capricious or unreasonable.

Big Tows' argument that its failure should be waived and its purported cure, after inspection, should be accepted by the Authority is misplaced. First, the Authority acknowledged that Big Tows could have cured from the time of its submission up to the time of the Authority's inspection. Big Tows failed to do so. Moreover, Big Tows' suggestion that it was ready and able to comply if awarded the contract ignores the Authority's need for the prequalification of bidders.

The Authority's factual finding that Big Tows' facility failed to have the requisite fencing at the time of the Authority's inspection was fully supported in the record. In addition, we decline to substitute our judgment for the Authority's regarding the Authority's conclusion that Big Tows' down-slope retaining wall failed to satisfy the prequalification requirement that the facility be "surrounded by a fence, wall or other man-made barrier that is at least six. . . feet high." That decision is left "to the agency's expertise and superior knowledge of a particular field." In re Hermann, 192 N.J. at 28.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division